U.S.A. v. Kelvin Crumpton. Oral argument, 15 minutes per side. Mr. Burress, for the appellant. Good morning again, Your Honor. It's Martin Burress on behalf of Kelvin Alexander Crumpton. Your Honor, this is Mr. Crumpton's direct appeal with regard to his conviction, his drug conviction. Mr. Crumpton challenges the search warrant that was issued by the state court and ultimately upheld in two motions to suppress by the district court. First off, the search warrant was defective in the fact that it lacked particularity. It indicated the wrong address. It indicated that the search was for a 361 address rather than a 335 Sloan address. The numbers, in fact, were identifiable on the outside of the building. But didn't it describe with some detail the nature of the building? And my understanding was that was the only building on the street or something like that? That's correct. It did, Your Honor. There was a photograph, a grainy photograph, that was included in the search warrant. There were actually two residential buildings. The search warrant identified one as an outbuilding of the other, but it actually was an inhabitable building in the back. Isn't a picture better than an address? Well, certainly you would think so, Your Honor, but in this case, somehow the government missed the fact that this was a multiple-dwelling building and that there were four separate apartments in the building. One with the hole in the wall? One of those. Apartment 3 is the one that Mr. Crumpton resided in. That's a pretty hard thing to know about. Well, Your Honor, it did have addresses. It had apartment numbers on the outside of the building. There were four rural mailboxes in front. Was there a separate address for the hole-in-the-wall section? There was apartment 3. Apartment 3 was the one in the back? Yes. And that's where he was found? That's where Mr. Crumpton was found, correct. And then apartment 4, am I right, is the one that you got to via the hole-in-the-wall? No, Your Honor. Apartment 3 was the one that was in the back. The only way that you could get to the main part of the building was there was this hole-in-the-wall that the Letovsky described as you could squeeze through it to get to the front of the other dwelling parts. On the front of the building, apartments 1 and 2 were where the other individuals stayed, including Ms. Smith, who was the defendant's mother, Ms. Jeanette Smith, who testified at trial. But there were also, beyond the fact that there were all of these deficiencies in the search warrant, the fact that Detective Ferris was the party who procured the warrant on behalf of the task force, and he ultimately also led the raid on the home. What about the reality that Mr. Crumpton had a lot of his stuff in a lot of different ones of these apartments, we'll call them? There was, and again, the record was kind of mixed in terms of what he had where. Okay, it sounds like he slept in at least one place. He slept in the back apartment. Python, the Gecko, and some other? He had a hole-in-the-wall that he could have access to the other part of the building with the other apartments. He had stuff there. And apparently some of his recording equipment was... Valuable stuff there. Yes, there was a computer, I believe, that was identified as being there, and there were also some speakers for his DJ business that apparently were... How did he get to that apartment? I'm sorry? How did he get to that apartment where the speakers and computer stuff were located? Well, I guess you could either squeeze through the wall or you could go outside into the other entrance to the apartment building because there were several entrances as well into the dwelling. So there were some items that he owned there, but in any event, once the search was undertaken, it should have been rather obvious to the team there who entered the building that there were several dwelling units, as well as the fact that there were six other people in the building besides Mr. Crumpton, which would suggest that there are other living quarters for sure. This was in the morning.  Would you call them four apartments? Yes, Your Honor. And Crumpton had his stuff and two of them? I think, yes, that would be a first. Weren't those the two, though, that the police searched? They searched the entire building. But, I mean, aren't those the two where they found incriminating evidence? Yes. So I guess they're struggling with why do we care about the other two if the part of the search that's hurtful to him are the places where he was either living or had his own personal items there. They wouldn't have known, Your Honor, that the stuff that was in the front apartment had anything to do with Mr. Crumpton. Except for the fact that the two apartments, the front and the back, were connected and accessible via a hole in the wall. So, hypothetically, if it had been like in a hotel where there's a doorway connecting two rooms, but sometimes it's shut and locked and other times it's available, would a search that specifies one unit allow, if the doors are open, allow the officers to go into the other unit in my hypothetical hotel room situation? I would think not, Your Honor. Specifically, if they're designated as separate units, indicated by separate addresses, separate billings for electrical meters, for mailboxes. I viewed the tape of the attack team moving in and they came off their vehicles with all their heavy military equipment and almost knocked over the four mailboxes that were in front of the house. Now, that would certainly be something that would be... Were the mailboxes on the front of the house, though, pretty much the only indication that there might be four separate... Units? Units in there. No, Your Honor, there were separate apartment addresses. In other words, there was apartment three, a number three on the door, there was a number two and a number one. The fourth apartment was actually the back building, which was not occupied by anybody at the time, but it was the fourth apartment. There were four electrical meters. Those... And again, the configuration of the house, the access to the front apartment was just by this hole in the wall, and even Agent Latosky, I believe in his testimony, said he had to squeeze through the wall to get to it. It wasn't something that was a door for anybody to walk in and have access to on a regular basis. This was just some kind of a rough hole chopped in the wall. So Judge Tarnow nevertheless upheld the validity of the warrant. Is that right? That's correct, Your Honor, he did. And I've... Escapes me, I don't remember, what was his reasoning on that? Because he certainly was generous with you on the... Or generous with your client on the Miranda warnings. Why didn't he feel like this was a bad search warrant? Well, he felt that there was probable cause. He made a very tertiary ruling on the confidential informant. The actual issue of the four subdivided apartments was never written in a motion. It was brought up by Mr. Crumpton at one of the hearings, but it was never developed to the point where the judge made a ruling on it. So he simply responded to the written motions. Isn't that a relative oops? Well, it's a big oops, Your Honor, for sure. But I think this court can look at it as plain error and certainly look at the totality of the circumstances again, which is the test on appellate review, and see that even if the warrant was sufficient for various reasons, the search itself is overbroad pursuant to Merlin v. Garrison and some of the other cases cited that once the police got there, they should certainly have known that this was more than a single unit. The fact that there were seven total people there would certainly have triggered somebody to think, well, this is seven in the morning. What should they have done then? They should have gone back to a magistrate and gotten another search warrant? That's what Garrison says, Your Honor. They should have ceased the search at that point in time and retreated or searched only the apartment that was identified in quotes, which it really wasn't, in the search warrants. So what is your view as to what would have been a legitimate scope of the search? Probably the back apartment where Mr. Crumpton resided. That's the only apartment that he basically resided on a full-time basis. Why not the place where he has important stuff? Your Honor, his mother lived in the front apartment. I guess he could leave things with his mother. She was the only person who actually testified about the configuration of the building and the apartments itself at trial. He brought his mother in and she said, yeah, I work at night and I come in here about mid-afternoon and I stay in the front apartment and I sleep there at night. And Ernest Crutchfield, who was Mr. Crumpton's cousin, also stayed there. So these were family members who were in the front. What role does Leon Goodfaith have in this case? I don't think it applies, Your Honor. Once the agents got into the apartment and saw what was there, they should have stopped and gone back and got a warrant for the whole premises or tried to narrow it down to what they were authorized to search, which was the apartment number three where Crumpton resided. That would be our position. But that's three? Yes, he lived in three. Or was he out building? Sorry. Thank you. Also, there was a motion with regard to the failure to leave an inventory at the house. Again, Mr. Crumpton's mother testified at trial and indicated she came and observed as the search team was doing their job. They had ultimately left. She went in and cleaned the house up from the search and found no warrant or inventory, I should say, left at the house. The police testified about the fact that they always do this as a general course of their procedure, but they couldn't specify if they recall doing that at all in this case. And, again, that goes to the reasonableness of the search, which Groth v. Ramirez tells us. However, the judge did rule on that and said that that was not any basis to set aside the search. The final issue, Your Honor, I'll just briefly mention, is that we argue that the government engaged in forensic misconduct in their closing argument. The U.S. attorney at the end of the evidence made closing arguments, basically said that after the defense argument, which indicated that the government basically suggested the government could have brought all these other witnesses in, the other six people in the house who could have testified as to the ownership of these bullets, but didn't do so. So on the rebuttal argument, the government came in and basically said, well, you know, we didn't hear this from anybody. Why didn't Ms. Smith, the defendant's mother, come and testify to this at another hearing? Well, she was never present at another hearing. There was any topic related to this. And, also, why didn't Mr. Crumpton mention this before? So that certainly shifted the burden to the defense. And then, finally, the U.S. What you've said so far doesn't sound that illegitimate. You're not allowed to say that kind of stuff? Well, she's basically saying that shifts the burden to the defendant. Why didn't you bring this evidence up earlier? Why didn't you tell us? You have an obligation. Why is that shifting the burden? I don't understand. I mean, it's just they're common-sense questions. Well, Your Honor, I think that it's certainly shifting the burden to the defense. It's putting a burden on the defense to bring testimony that the bullets were owned by somebody else. And she did say that. She said in her testimony that they were owned by Crutchfield and Cametha Talley, who was the girlfriend who actually went to a shooting range. And that was – Is there a comment on the defendant's silence when the prosecution says defendant didn't say it? I think that there is a comment on the defendant's silence. It suggests an obligation of the defense to bring forth evidence that he has no obligation to bring forth. And Mr. Crumpton did not testify in this particular trial. Thank you. Good morning. I'm a police of the court, Shane Crowley of the United States. I'd like to focus first on the multi-unit dwelling argument. And much of what I heard counsel say to the court is just not in the record. And that's because this motion was never before the court, and the court never considered it. I'd like to just recap briefly the procedural posture. Mr. Crumpton filed a motion to suppress in January that had two arguments. One, insufficient particularity as to the description, which we've already addressed with the photograph, and then the lacking probable cause because of the confidential informant. At the hearing, Mr. Crumpton, not his attorney, but Mr. Crumpton pro se says, I want to argue this is a multi-unit dwelling. The district court says, wait a minute, that's not before me. Why don't we adjourn this, you and your attorney talk, figure out what we're going to argue, and then come back and see me in a month. They do. Mr. Crumpton does not raise this. This issue was never presented to the court at any point. That's why the court did not rule on it. And there are no facts to support much of what counsel is saying. In his brief, he cites this series of pages. These are photographs that were introduced. Essentially they tried to authenticate photographs of the residents through the ATF agent. There is no photograph in the record that references apartment numbers. There were nine photographs presented to the ATF agent. He said, I don't recognize this ninth one. This does not fairly and accurately depict the apartment or the residents on the day of the search or when I saw it. The defendant did not offer that photograph. The mother testifies. She could not authenticate the photograph. There is no evidence in this record to support there were apartment numbers. Yes, if you watch the video of the search warrant, there were multiple mailboxes. These were not directly in front of the residents. They were, let's say, ten feet beside it. We have no facts to support if those were all linked to that residence. They very well could have been mailboxes for the other side of the street because mailmen don't just go back and forth to bounce when they're delivering the mail. Often they're all on the same side of the street. We don't know because those facts are not in the record. Simply put, it cannot be plain error for a district court not to sui sponte suppress evidence for an issue that's not raised before him. And that's what we have here. There's a reference to multiple utility meters. There is one photograph. I will concede there's a photograph in the record that suggests that there is a utility meter and a bunch of wires hanging off of it and perhaps another one there. Whether those are both power meters, whether those are power and gas, it is entirely unclear. But again, no facts to make any sort of finding in order to make a ruling of this nature. So there's no testimony? There is no testimony, and basically what we have are some photographs that could be there are multiple inferences that could be drawn, but the district court did not draw any because the district court was never presented this issue. And, in fact, the defendant, when given an opportunity to go back and brief this issue and put in facts, declined to do so. And that's because he was fixated on this notion that there were multiple search warrants. And I'm sure that... Multiple search warrants? Yes, Your Honor. If you read through what is drawn most of the issues here, if you read through all the suppression issues, Mr. Crumpton persistently believed that there was a different search warrant shown to him on the day of the search, that it was a tether violation. The warrant was for a tether violation for another individual that was there, a Brandon LaVar, and that's why he wanted to fire the first lawyer. And if you look at the request to adjourn the trial on the first day of trial, as well as his request to fire his lawyer on the third day of trial, it all stemmed from this persistent belief that he received a different copy of the warrant in discovery than when he was shown on the day of the search warrant itself, that there were essentially two warrants. The one that you have before you that I cited, that had the photograph that Judge Sutton referenced, is the one he received in discovery, but he kept saying, that's not the one I was shown, despite the fact that the audio recording or the agent talked about it with him, described the very warrant that we are talking about today with the photograph and the request to search drugs. This is a basic question, which I apologize for not knowing, but in a normal case, wholly apart from this case, do you leave a copy of the search warrant with the defendant, with the person who owns the property or whoever's there? Well, it depends, Your Honor. Rule 41 requires you to either turn a copy over to the person or leave a copy behind. In this case, the defendant was taken into custody, so you're not going to leave a copy with him because whatever detention facility you take it to, it's going to not let him have paperwork, at least initially. So you would have left a copy behind. In the place that's being searched? Even if, say, it's a place that's an abandoned place? The rule states that you were to leave a copy behind. Now, where that copy would be left, in a house like this, where there is just stuff strewn everywhere, typically that would be left in a situation where they could find it, a kitchen table or something of that effect. It's unclear where that was here because there was no evidence put forth on the part of the defendant who is the one that bears the burden of showing that it was not satisfied and that there was prejudice. That was not done here. And certainly, even if there was a Rule 41 violation, which I certainly do not concede that there was, it's a ministerial violation. It's not something that results in suppression. So here the officer said his normal practice was to leave it behind and he thought that he did that here, is that right? Am I correct? That's the substance of it, yes, Your Honor. And the district court found that essentially that was sufficient because there was nothing to rebut that. So there were six people in the insides of the building that were at least held by the police for a little bit of time. Correct. Were all of them arrested or just a couple? And what happened to the others? I actually don't know the answer to that, Your Honor. My impression is or my understanding is that not all of them were arrested, but I'd be speculating as to the rest. I suppose there was the girlfriend and the mother were there? Am I right or wrong? Actually, the mother was not there. She arrived later in the day because the warrant, as most warrants happen, they happen early in the morning in order to try to prevent some sort of incident. So the warrant happened early in the morning. The mother gets off work. She came over. I think she said somewhere around 12 or 1. At that point, they're wrapping up because there was a lot to search through here just because of the way he'd kept this. So a copy could have been given to her? She said that she did not receive a copy. She testified to that effect. So while it could have been based on this court, I mean she certainly didn't strike, it did not come across very credible based on her testimony at trial, but she said that she did not receive one. That does not mean that one was not left behind. And, in fact, she said, I didn't get in there until after they'd already left. I would also note that despite counsel's assertion, the mother did not sleep there. The mother did not live there. In fact, in page 523 of the record, the mother stated very clearly that she slept in a different house in a different part of town on Joy Road. There were no other beds in this house for people to sleep. There was a mattress. I will admit there was a mattress in the front, but there were no other beds other than the one in which the defendant and his girlfriend were found. I would also note that the defendant had keys for the entire residence, the front and the back. This was not a multi-unit dwelling. But, again, it cannot be plain error for the court not to sui sponte, suppress this based on facts. Even by Judge Tarnow's standards? I'd rather not answer that one, Your Honor. I would note that the Musascio opinion. It's assumed to be error based on his view of sui sponte. Perhaps, Your Honor. I would note that Musascio, the Supreme Court case that came out last month, certainly suggested this exact same issue, not as far as the suppression, but that it cannot be plain error for a court not to rule on something never presented to it. But, again, because we have no facts here, it simply cannot support such a finding. And also, just based on the facts, that the police in conducting their initial surveillance, there was nothing on the outside to indicate this was a multi-unit dwelling. Turning briefly just to the argument of prosecutorial misconduct. In closing, the defense argued extensively how the government had the ability to bring all these witnesses, witnesses that would have proven who the true owner of these bullets were. Keep in mind that the defense theme throughout was, we're conceding that you could find that the drugs belonged or that Mr. Crumpton possessed the drugs. We're only going to argue about the bullets. That was their theme at trial. It was said both in the opening and the close. The defendant basically said in closing, they could have brought all these other witnesses here, but they didn't. And why? Because that would undercut the testimony they wanted to present to you. And he focused extensively on the mother, a mother who I think a fair reading would be that she perjured herself, but a mother that insisted, she was very persistent in saying that she had testified about the bullets in the earlier evidence you're hearing this summer. The prosecutor handed her a transcript and said, why don't you look through it? You can point me to where you testified about that. And the mother read through the transcript and said, well, I did. It's not in here, but I know I talked about it, essentially implying that the court reporter must have missed it. You know, from your years of prosecution, you must understand that there's a rule that allows mothers to come in and say whatever is going to help their sons usually. I fully appreciate that. I've never seen one charged with perjury in all these years. But it also is possible that someone could think that they had testified about something. Certainly, Your Honor. And be presented with a transcript and say, well, I know that I testified. It must be the reporter didn't get it, or a lot of people believe in conspiracies. Absolutely, Your Honor. So in any event, she does testify at trial that the ammunition was not her son's, right? That's correct, Your Honor. And she says the true owners were the girlfriend and another individual. I think his name was Ernest Crutchfield. And so the defense argument in closing is, look, we know who the owners are. They didn't call Mr. Crutchfield. They didn't call Ms. Talley. And why? Because that would undercut their argument here. That would undercut their theme. Okay. And what's the government's evidence that it was the defendant's ammunition? The government's evidence, well, at this point, was only the second statement. Prior to trial, it was both of them. But at this point, it's the second statement. Second statement. Anything else? That is the bulk of it. And certainly the ammunition is beside the tank where his snake and geckos are. There's certainly his possessions are the bulk of the front as well, the DJ equipment. There are other digital scales and things. So the ammunition is near his other possessions? Yes. Yes, that's correct. I mean, as I recall from the transcript, it's right beside the tank where the snake was being held. So the defendant is essentially saying the mother told you that there's the only one that's telling you who owns these bullets. And so the government, the prosecutor in rebuttal, says essentially pointing to things to challenge her credibility so that the jury can decide for itself whether or not her testimony as to the true owner of the bullets was credible. And it's that point where she says, if this is the case, why didn't we hear about it before? This is not. Yes, but the prosecutor says two things that are troubling to me. One is defendant didn't say it, in a query whether that is implicating his right to remain silent. And the other thing is, do you think that the government really wants to charge somebody that's innocent? Your Honor, I think it's important to break those down. I think the first one would be in reference to the defendant in his statements. I think that would be the inference to be drawn there. The defendant had already given statements that the jury had heard, not just heard about, but actually heard through the audio recordings. And in the second statement, the more fulsome one, the defendant had said that there were some bullets laying around and had said actually that he had found them and left them there in case someone needed them. Not to quote the colorful language that's in the brief. I think a fair reading of what she was saying is that she was mentioning that, not his obligation or his right to stay silent and somehow shifting the burden that he had to present evidence at trial to rebut that. As for the second portion of Your Honor's question, whether or not the government wants to prosecute someone that's innocent, that is arguably improper, but certainly it is isolated and would not rise to the level of flagrancy. And I think the best evidence of this is the fact that the defendant did not object at all to anything that was said here. The defendant did not object, and immediately after the rebuttal, the district court gave the typical instruction that everything the attorney said should not be considered evidence and it's just argument. Only focus your verdict on the evidence before you. And in fact, the judge said this both before argument and afterward. If this was so flagrant, this one isolated comment, if this was so flagrant, a defense attorney would have said so and would have objected. There is nothing here. And certainly, referencing back to your question, Judge Sutton, if the district court, who was not shy, was so concerned about whether or not it was flagrant, he too would have jumped in. Neither did. And for that reason, the rulings that the district court did make, as well as the one that it did not make, because the issue was not before it, do not warrant a suppression of any of the evidence found, and the prosecutor did not commit prosecutorial misconduct. And for those reasons, the verdict should stand. Thank you. Thank you. Just briefly, Your Honor, with regard to the forensic misconduct issue, it's not the job of the district judge to jump in and object for trial counsel. And the judge didn't do that, nor was there much of evidence that he did at any time during the trial. As far as the statement by the prosecuting attorney at the time, it clearly went to the defendant's right to remain silent and shifting the burden to him to bring forth evidence that apparently had an obligation not only to bring forth at the trial, but to the authorities, which was totally improper. And finally, this was the last statement that the U.S. attorney made prior to the jury going in to deliberate. You know, do you really think we want to charge somebody who's innocent? Certainly is an effort to buttress the government's case. There wasn't an objection, right? There was not an objection at trial. We would be reviewing for plain error? That's correct, Your Honor. Thank you. Thank you. Thank you both for the argument. The case will be submitted. Would the clerk adjourn court, please?